**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2021-0447, <u>Appeal of Matthew Graves & a.</u>, the court on December 13, 2023, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve the case by way of this order.  <u>See</u> <u>Sup. Ct. R.</u> 20(2).  The appellants, Matthew Graves, Laura Graves, Ann Shaw, and Suzanne Fournier, appeal an order of the New Hampshire Water Council upholding the issuance of an alteration of terrain permit by the appellee, the New Hampshire Department of Environmental Services (DES), to the intervenor, Leighton A. White, Inc. (White, Inc.), to expand its gravel mining operation.  We affirm.

I

The following facts were either stated in the Water Council's order or are drawn from the contents of the documents in the certified record before us.  Spring Creek Sand and Gravel (SCSG) owns land in Milford that has been used as a gravel pit for many years.  In September 2019, White, Inc. applied for an alteration of terrain permit for a ten-acre expansion of gravel mining operations on SCSG's land.  The application acknowledged that the New Hampshire Natural Heritage Bureau had reported that the Blanding's turtle, an endangered species, had been observed near the site, but not within it.  Because DES lacks expertise with threatened and endangered species, DES referred the matter to New Hampshire Fish and Game (NHFG).

While investigating the matter, NHFG alerted White, Inc.'s consulting engineer to the potential presence of the spotted turtle and the eastern hog-nosed snake, additional threatened and endangered species in New Hampshire.  Biologist Doperalski, a certified wildlife diversity biologist with NHFG who led the review, noted that NHFG's review "was much more thorough than usual," lasting approximately five months.  NHFG analyzed internal and confidential information such as nesting site locations, relied on information about the threatened and endangered species near the site, utilized information from prior permit applications of nearby lots, communicated with White, Inc. and its consulting engineers many times to gather more information on the proposed operations, and utilized scientific findings regarding what benefits the species.  When reviewing the permit application, DES did not require a pre-permit study on the site, nor did NHFG recommend one, but NHFG assumed that threatened and endangered species could be present.

After its review, NHFG recommended 23 conditions for the permit. Those recommendations included, among others: installing a silt fence, inspecting the area to be affected by the installation of the silt fence for threatened and endangered species, allowing NHFG access to the site, having a wildlife biologist search the area, and reporting to NHFG immediately upon seeing a threatened or endangered species. DES ultimately issued the permit, and incorporated all of NHFG's recommendations into the permit as requirements.

The appellants live near the gravel pit and use the surrounding land to hike and observe wildlife. They appealed the issuance of the permit to the Water Council. White, Inc. intervened. The Water Council upheld the issuance of the permit after a two-day hearing. The appellants moved for a rehearing, which the Water Council denied. This appeal followed.

II

RSA chapter 541 governs our review of Water Council decisions. See RSA 21-O:14, III (2020). Under RSA 541:13, we will not set aside the Water Council's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that the decision is unjust or unreasonable. RSA 541:13 (2021). The Water Council's findings of fact are deemed prima facie lawful and reasonable. See id. In reviewing the Water Council's findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but rather, to determine whether the findings are supported by competent evidence in the record. Appeal of Town of Lincoln, 172 N.H. 244, 247 (2019). We review the Water Council's rulings on issues of law de novo. Id.

The appellants first assert that DES was prohibited from issuing an alteration of terrain permit without a pre-permit study. They argue that a pre-permit study, including on-site searches and data collection, is necessary to understand how the threatened and endangered species use the property, and without one, DES and NHFG "could not understand the [threatened and endangered species'] behaviors, and thus certify that the design of the project would avoid a taking." Even with the potential presence of threatened and endangered species, however, DES can issue an alteration of terrain permit without requiring a pre-permit study of the sort outlined by the appellants. New Hampshire Administrative Rule, Env-Wq 1503.19(h) governs the issuance of alteration of terrain permits. N.H. Admin. R., Env-Wq 1503.19. At the time the permit was issued, Env-Wq 1503.19 provided that DES "shall not issue an [alteration of terrain] permit unless the applicant demonstrates that . . . [t]he project has been designed in a manner that will not result in adverse impacts to state- or federally-listed threatened or endangered species." N.H. Admin. R., Env-Wq 1503.19 (effective August 15, 2017 to June 1, 2020).[1] The regulation did not

---

[1] The current version of the rule differs from the versions that were in effect during the permitting process. The parties agree that the version that became effective on August 15, 2017 applies to this application.

2

require that the information supporting the design include a pre-permit study of the site.  We have previously interpreted Env-Wq 1503.19(h) to mean that to receive a permit, the project must be designed to not result in adverse impacts to threatened and endangered species.  Appeal of Suzanne Fournier & a., No. 2018-0617 (non-precedential order at 2), 2019 WL 6040519 (N.H. Nov. 14, 2019) (Fournier I).  Accordingly, an alteration of terrain permit may be issued without a pre-permit study so long as the project is designed to not result in adverse impacts to threatened and endangered species.

Relying on the concurrence in Fournier I, the appellants argue that a pre-permit study may be required where there is otherwise insufficient evidence that a project is designed to satisfy Env-Wq 1503.19(h).  They contend that DES and NHFG had insufficient evidence about the potential presence of threatened and endangered species to issue the permit here.  The concurrence in Fournier I simply noted the absence of data to support the application in that case, which, as the expert noted, might have been supplied by a pre-permit study.  See Fournier I, (non-precedential order at 7), 2019 WL 6040519.  Where sufficient data is available regarding the potential for threatened and endangered species, a pre-permit study is not always required.  See Appeal of Suzanne Fournier & a., No. 2021-0085 (non-precedential order at 3-4), 2022 WL 1198031 (N.H. April 22, 2022) (Fournier II).  In Fournier II, we upheld the issuance of an alteration of terrain permit without a pre-permit study, in part, because unlike in Fournier I, in Fournier II other evidence in the record showed that the project was designed to not result in adverse impacts.  Id.

Here, DES had sufficient data to determine, without a pre-permit study, that the project was designed to not result in adverse impacts to threatened and endangered species.  NHFG assumed "that there was a likelihood that [threatened and endangered species] could be on the project area."  That assumption informed the project, which was designed to prevent adverse impacts to threatened and endangered species.  Also, NHFG conducted a review of available data that "was much more thorough than usual."  Doperalski testified that she used information from the NHFG database, prior studies NHFG conducted of nearby land, "ongoing and current research," "learned experience from other projects," and scientific findings of restrictions beneficial to the species, such as "design considerations, buffer impacts, [and] timing for certain types of activities."  NHFG used that data, combined with its knowledge of the project, to create its 23 recommendations for the permit that were incorporated therein.  Those recommendations required ongoing vigilance in locating any threatened and endangered species and imposed precautions to avoid harming them.  The appellants' expert, Dr. Ryan, agreed that, despite some differences, NHFG's recommendations generally comported with his own.

Nevertheless, the appellants rely on Ryan's contention that on-site pre-permit studies were necessary for DES and NHFG to understand how the threatened and endangered species behave in the area in order to properly design the project to avoid a taking.  He testified that the area was a highly ranked

habitat for the Blanding's turtle, spotted turtle, and the eastern hog-nosed snake. He opined that someone should search the area in the springtime, when they are more likely to be found. To find an eastern hog-nosed snake, he proposed taking specific measures, such as enclosing the area and installing "pitfall traps." Doperalski countered Ryan's testimony, explaining that "it would take several years to be able to detect a Hognose population at a property." She reasoned that their "highly elusive" nature combined with the inadequate existing search methods makes them "very difficult to detect in a landscape."

The Water Council agreed with Doperalski that NHFG had adequate data, without a pre-permit study, to develop its recommendations. Given the supporting data, the Water Council concluded that NHFG's recommendations were sufficient to establish that the project was designed in a manner to not result in adverse impacts. Engineer McCarthy, a civil engineer responsible for reviewing the project for DES, testified that DES incorporated NHFG's recommendations into the permit and that White, Inc. was "required to comply with them." The Water Council further noted that Ryan's proposals "were consistent" with NHFG's recommendations. The Water Council did not act unreasonably by accepting Doperalski's and McCarthy's conclusions despite Ryan's testimony. See Appeal of Allen, 170 N.H. 754, 762 (2018) ("When faced with competing expert witnesses, a trier of fact is free to accept or reject an expert's testimony, in whole or in part." (quotation omitted)).

Next, the appellants assert that DES and NHFG applied an incorrect standard to their review of the permit. They assert that NHFG designed the permit conditions to "minimize" adverse impacts to threatened and endangered species, rather than to "not result in adverse impacts." As we previously determined, the proper standard, as set forth in Env-Wq 1503.19(h), is that the project must be designed to not result in any adverse impact to threatened or endangered species. Fournier I, (non-precedential order at 2-3), 2019 WL 6040519. Here, the Water Council found that DES applied the correct standard. Based on our review, DES and NHFG applied the correct standard.

Similar to Fournier II, DES in this case emailed NHFG informing it that the project must be designed to not result in adverse impacts. See Fournier II, (non-precedential order at 3), 2022 WL 1198031. Specifically, McCarthy reminded NHFG that DES "must determine whether an applicant for an [alteration of terrain] permit has demonstrated that the project 'has been designed in a manner that will not result in adverse impacts to state- or federally-listed endangered species.'" She then asked that NHFG "indicate whether there are any additional design modifications necessary to avoid adverse impacts that could jeopardize the continued existence of threatened or endangered species in the project area." NHFG responded that it "has no further comments to provide at this time." Thus, NHFG indicated that the project, including NHFG's 23 recommendations, was designed to not result in adverse impacts. In another resemblance to Fournier II, Doperalski corroborated in her testimony before the Water Council that the project was designed to not result in adverse impacts, explaining that "our intent

4

was to avoid impacts to the species." See id. Thus, DES and NHFG applied the correct standard.

The appellants contend that the evidence does not suffice because although Doperalski testified that the project was designed to not result in adverse impacts, she also testified that the project was designed to minimize adverse impacts. The Water Council, as the fact finder, weighs the evidence and makes determinations as to the credibility of the witnesses. See In the Matter of Aube & Aube, 158 N.H. 459, 465-66 (2009) ("The fact finder may accept or reject, in whole or in part, the testimony of any witness or party, and is not required to believe even uncontroverted evidence."). While Doperalski testified that NHFG's "recommendations were provided to minimize the potential for any adverse impact," she later testified that NHFG's "intent was to avoid impacts to the species." To the extent that her testimony may be inconsistent, the Water Council was free to accept one portion of her testimony over another. See id.

For the foregoing reasons, we affirm the orders of the Water Council.

Affirmed.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred; HICKS, J., sat for oral argument but did not participate in the final vote, see N.H. CONST. pt. II, art. 78.

**Timothy A. Gudas,
Clerk**

5